UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | |
|---|---|
| DEBORAH ARREDONDO, § | |
| § | |
| Plaintiff, § | |
| VS. § | CIVIL ACTION NO. M-11-84 |
| § | |
| HARTFORD LIFE AND ACCIDENT § | |
| INSURANCE COMPANY, *et al*, § | |
| § | |
| Defendants. § | |

**<u>ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>**

**I.     Introduction**

Now before the Court is Defendant Hartford Life and Accident Insurance Company's ("Hartford") Motion for Summary Judgment.  (Doc. 35).  Plaintiff Deborah Arredondo, individually and as executrix of the Estate of Danny Trevino, originally filed suit against Hartford and International Bank of Commerce ("IBC")[1] in the 93rd Judicial District Court, Hidalgo County, Texas, on February 25, 2011.  (Doc. 1, Ex. A).  Plaintiff's "Second Amended Petition," the live pleading in this action, alleges that as early as July 2004, IBC "offered and sold" an accidental death and dismemberment insurance policy ("the policy") to Trevino, and that the policy was issued and underwritten by Hartford.  (Doc. 21).  Trevino allegedly paid premiums on the policy for years until January 20, 2009, when he "died of an accidental death caused by the 'combined effects of mixed drug and alcohol intoxication'" as reflected in the certificate of death and autopsy report.  *Id.*  Plaintiff alleges that Trevino "did not die as a result of being legally intoxicated from the use of alcohol; he died unexpectedly because of the effect

---

[1] The Court determined that non-diverse Defendant IBC was improperly joined and dismissed it from this action. (Doc. 20).  Therefore, only Plaintiff's claims against Hartford remain.

that alcohol had with his prescribed medications." *Id.* Subsequent to Trevino's death, Hartford denied Plaintiff's claim to recover benefits under the policy purchased by her father. *Id.* Based on these allegations, Plaintiff asserts causes of action against Hartford for breach of contract, bad faith, and violations of the Texas Deceptive Trade Practices Act ("DTPA") and Insurance Code. *Id.*[2] In its November 22, 2011 order granting Hartford's motion to dismiss, the Court dismissed Plaintiff's claims that Hartford violated the DTPA and Insurance Code by making a misrepresentation to Trevino that the principal sum of the policy would be paid in the event of his accidental death. (Doc. 27). Therefore, the claims that remain essentially consist of Plaintiff's challenge to Hartford's interpretation of the policy as applied to the circumstances of Trevino's death. (Doc. 21). Hartford now moves for summary judgment on these claims, contending that it correctly and in good faith denied Plaintiff's claim for benefits based on its application of the policy's definition of "injury" and the prescription drug and intoxication exclusions, discussed *infra*. Upon review of the Motion, Plaintiff's response, and the record, in light of the relevant law, the Court finds that the Motion should be granted for the following reasons.

## II. Hartford's Motion for Summary Judgment

### A. Standard of Review

A district court must grant summary judgment when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A fact is material if it might affect the outcome of the lawsuit under the governing law,

---

[2] Plaintiff has also asserted "conflict of interest" as a cause of action, alleging that "as the issuer and administrator of the stated policy, Defendant Hartford has a conflict of interest during the claim analysis and review: There is no independent decision regarding coverage under a policy of insurance thereby creating an inherent predisposition for denial of coverage." (Doc. 21 at ¶ 16). This does not appear to constitute a cause of action under Texas law, and in any event the Court has determined for the reasons stated *infra* that Hartford properly denied Plaintiff's claim. Therefore, the purported conflict of interest did not result in any cognizable damages to Plaintiff.

and is genuinely in dispute only if a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A party moving for summary judgment has the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings and materials in the record, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); FED. R. CIV. P. 56(a), (c). Once the moving party carries its burden, the burden shifts to the nonmovant to go beyond the pleadings and provide specific facts showing the existence of a genuine issue for trial. *Celotex*, 477 U.S. at 324; FED. R. CIV. P. 56(c), (e). In conducting its review of the summary judgment record, the court "may not make credibility determinations or weigh the evidence" and must resolve doubts and reasonable inferences regarding the facts in favor of the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 255; *Dean v. City of Shreveport*, 438 F.3d 448, 454 (5th Cir. 2006). However, the nonmovant cannot satisfy its burden with "conclusory allegations, unsubstantiated assertions, or 'only a scintilla of evidence.'" *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)); *see also Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003) ("Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment.").

Texas law, which governs this diversity case, places the burden to show coverage on the insured and the burden to establish an exclusion to coverage on the insurer. *Century Sur. Co. v. Hardscape Constr. Specialties, Inc.*, 578 F.3d 262, 265 (5th Cir. 2009). When interpreting insurance policies, courts in Texas use general rules of contract construction to ascertain the parties' intent. *E.g.*, *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d

118, 126 (Tex. 2010). The court first looks to the language of the policy because it must presume that the parties intend what the words of their contract say. *Id.* The policy's terms are given their ordinary and generally-accepted meaning unless the policy shows the words were meant in a technical or different sense. *Id.* Policy terms that are ambiguous, *i.e.*, subject to more than one reasonable construction, are interpreted in favor of coverage. *Id.* at 133. Where an ambiguity involves an exclusionary provision of a policy, the court "'must adopt the construction...urged by the insured as long as that construction is not unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent.'" *Id.* (quoting *Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 741 (Tex. 1998)). However, an ambiguity does not exist simply because the parties interpret a policy differently. *Id.* If a contract as written can be given a clear and definite legal meaning, then it is not ambiguous as a matter of law and must be enforced as written. *Id.*; *see also Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d 20, 23 (Tex. 2008).

**B.     Summary Judgment Evidence**

The summary judgment evidence establishes that on the date of his death, Trevino was insured by an accidental death and dismemberment policy issued by Hartford. (Doc. 35, Ex. A; Doc. 36, Exs. B, C). Plaintiff, who is Trevino's daughter, was the beneficiary. *See* (Doc. 36, Ex. C). In relevant part, the policy provides coverage for "injury" defined as:

> bodily injury resulting directly from accident and independently of all other causes which occur while the Covered Person is Covered under the Policy. Loss resulting from…medical or surgical treatment of a sickness or disease…is not considered as resulting from injury.

(Doc. 35, Ex. A at HART 00026; Doc. 36, Ex. B at HART 00022). The policy also excludes coverage for any loss resulting from:

> [i]njury sustained while voluntarily taking drugs which federal law prohibits dispensing without a prescription…unless the drug is taken as prescribed or administered by a licensed physician…[and] injury sustained as a result of being legally intoxicated from the use of alcohol.

(Doc. 35, Ex. A at HART 00027; Doc. 36, Ex. B at HART 00024).

Excerpts from Trevino's medical records reveal that beginning in 2007, Trevino's doctors prescribed him over twenty different medications, including Methadone (an opiate), Diazepam (a benzodiazepine originally called Valium), and Venlafaxine (an antidepressant) to treat his posttraumatic stress disorder, depression, and chronic pain conditions. (Doc. 35, Exs. B, C; Doc. 36, Ex. F). The FDA warnings for these three medications, which must be prescribed by a physician, caution against the use of alcohol while taking the medications. (Doc. 35, Ex. C; Doc. 36, Ex. H). In June and July 2007, Trevino admitted to doctors that he had been drinking two to three bottles of wine daily and promised to abstain from drinking alcohol after being advised accordingly. (Doc. 35, Ex. B at pp. 14-15; Doc. 36, Ex. F at pp. 14-15). From this time until December 2008, doctors repeatedly advised Trevino to avoid alcohol. *Id.* at pp. 16-25. By September 2008, the doctor noted continued but "decreasing" alcohol abuse. *Id.* at p. 23. In December 2008, Trevino was again prescribed Diazepam and Venlafaxine, and "brief psychotherapy and education regarding meds was provided." *Id.* at p. 25. Again, Trevino was advised to avoid alcohol. *Id.*

On January 20, 2009, Trevino was found dead in his home. The autopsy report included findings of a "high to toxic" level of Methadone, therapeutic levels of Diazepam and Venlafaxine, and a blood-alcohol level of 107 mg/dl, and concluded in part as follows:

> When multiple [central nervous system] depressants are taken together, such as in this individual on a benzodiazepine, an antidepressant (Venlafaxine), a narcotic analgesic (methadone) and drinking alcohol, the effects may be synergistic and lead to respiratory depression (severely depressed breathing), slowed heartbeat (bradycardia), coma and death. The decedent was reportedly taking some of these medications for PTSD and

>depression, and there is no indication that this mixed drug and alcohol intoxication was intentional (no evidence of a suicide).

(Doc. 35, Ex. D; Doc. 36, Ex. A). The report determined that the cause of death was "combined effects of mixed drug and alcohol intoxication" and that the manner of death was "accident." *Id.* Plaintiff has also submitted the report of her expert, Dr. Manuel J. Sanchez, stating his opinion that (1) Trevino did not die as a result of his medical treatment, *i.e.*, his use of the 21 medications and four vitamins prescribed by his physician; (2) Trevino did not die as a result of alcohol intoxication, as his blood alcohol level was "not a toxic level in and of itself"; and (3) Trevino did not die as a result of taking medications in a manner other than as prescribed, as his medical records indicate (or at least do not disprove) that he was taking the medications "regularly and correctly" and was "drinking much less." (Doc. 36, Ex. G). Dr. Sanchez reiterates the findings in the autopsy report that Trevino's death "was accidentally caused by the combined effects of prescribed mixed drugs and alcohol intoxications." *Id.*

Plaintiff made a claim for accidental death benefits under her father's policy with Harford, which claim was denied on the same bases asserted in this lawsuit. (Doc. 36, Exs. D, E).

**C.    Analysis**

**1.    Definition of "Injury"**

Again, the policy covers "injury" defined as "bodily injury resulting directly from accident and independently of all other causes," and further states that "[l]oss resulting from…medical or surgical treatment of a sickness or disease…is not considered as resulting from injury." Appealing to the policy's definition of injury, Hartford first argues that no coverage exists because Trevino's death resulted from "medical treatment of a sickness or disease," *i.e.*, Trevino's use or misuse of prescription drugs, and/or did not result directly from

6 / 12

accident and independently of his use or misuse of the drugs. (Doc. 35). Scant case law exists interpreting the "medical treatment" language, none of it recent. The Texas Supreme Court has indicated that "medical treatment" includes "the prescription of drugs to relieve or cure a patient's condition." *Scarborough v. Aetna Life Ins. Co.*, 572 S.W.2d 282, 284 (Tex. 1978). In a case cited by both parties, another Texas court determined that a physician's administration of morphine as treatment for delirium tremens brought on by excessive drinking constituted medical treatment. *Flint v. Travelers Ins. Co.*, 43 S.W. 1079 (Tex.Civ.App. 1898, writ ref'd). The accidental death policy at issue in *Flint* precluded coverage for "any injury happening through or while under the influence of intoxicating drinks or narcotics" and injuries "resulting wholly or partly, directly or indirectly, from…medical treatment." *Id.* at 1080. Noting that the use of morphine to treat the insured was proper, but in quantity an unintentional overdose leading to the insured's death, the court concluded that the policy language negated coverage given the insured's "extended intoxication…immediately preceding his death" and the provision of medical treatment "superinduced by the intoxication." *Id.* at 1081. Both parties also cite to *Barkerding v. Aetna Life Ins. Co.*, 82 F.2d 358 (5th Cir. 1936), where the policy at issue insured against loss "resulting directly [from accident] and independently of all other causes" and also negated coverage for loss "caused directly or indirectly by medical or surgical treatment." *Barkerding*, 82 F.3d at 358. In *Barkerding*, the insured sought coverage for the amputation of his toe and leg resulting from a burn he sustained after applying heat to an infected area of his foot as directed by his physician. Addressing the "medical treatment" language in the policy, the Fifth Circuit explained that "[m]edical and surgical treatment mean what is done by a physician of any recognized type or by a surgeon in diagnosing a bodily ailment and seeking to alleviate or cure it." *Id.* at 359. Further, this treatment "includes the things done by the patient to carry out

specific directions given for these ends by a physician." *Id.* The court determined that the burn (and eventual amputation) resulted in part from the original, accidental wound but also from the insured's choice to use a high-wattage electric bulb to apply heat, which was not accidental. *Id.* Further, even if accidental, "it was an accident caused directly or indirectly by medical treatment [*i.e.*, the use of heat as a curative agent] prescribed by a physician." *Id.* On these grounds, the court concluded that both the "independently of all other causes" and "medical treatment" language precluded coverage under the policy. *Id.* In so finding, the court also noted that "[t]he excess of heat is like an overdose of a prescribed drug ignorantly taken by a patient, the effect of which is held to be the result of medical treatment under policies like this one." *Id.* (citing cases).

The cases cited above provides some guidance on whether the medical treatment language of the Hartford policy precludes coverage here: for one, they all support Hartford's position that "medical treatment" encompasses Trevino's use of medication prescribed by his doctors. However, *Flint* and *Barkerding* are factually distinguishable from this case, in that they both involved policies excluding coverage for injury resulting "indirectly" from medical treatment, and in *Flint* the court's final determination rested on its intertwined application of both the medical treatment language and a separate intoxication exclusion in the policy. Most notably, in both of these cases, the medical treatment at issue involved mistakes in the provision of medical treatment or in the interpretation of a doctor's advice, whereas here Trevino's misuse of the Methadone prescription, or at the very least his use of alcohol in combination with his medications, specifically contravened his doctors' orders. Therefore, these actions more accurately fall within the prescription drug policy exclusion discussed *infra*. Still, the Court agrees with Hartford that the "independently of all other causes" language in the Hartford policy

prevents coverage, as the medications found present in therapeutic levels (and therefore presumably taken in compliance with Trevino's prescriptions) were themselves a partial cause of his death. That is, even conceding that the "synergistic" and eventually fatal effect of all three of the medications and alcohol was itself accidental, this accident was not independent of Trevino's use of two of those medications as prescribed. This determination is consistent with the Texas Supreme Court's decision in *Mut. Benefit Health & Accident Ass'n v. Hudman*, 398 S.W.2d 110 (Tex. 1965), cited by both parties, in which the court concluded that the insured's death from ventricular fibrillation, itself resulting from the concurring causes of overexertion and a diseased heart, was not "independently of all other causes." The court noted that "independently" means "solely," "only," or "standing alone," and that "[t]he logical meaning of the policy terms limits the coverage to accidental bodily injuries which are the sole cause of death." *Hudman*, 398 S.W.2d at 112. Since the policy did not cover non-accidental bodily injuries such as the insured's heart disease, and both overexertion and heart disease "proximately concurred to produce death," the policy did not afford coverage to the insured. *Id.* at 112-13. The Court similarly finds that the Hartford policy does not cover injury resulting from Trevino's use of medication as prescribed, which in combination with the misuse of Methadone and alcohol intoxication resulted in his death. Therefore, Trevino's "injury" did not result from an accident independently of medical treatment, preventing coverage in this case.

**2.       Prescription Drug and Intoxication Exclusions**

Even assuming that Trevino suffered a covered injury, Hartford further supports its denial of Plaintiff's claim by appealing to the policy provisions excluding coverage for loss resulting from (1) "[i]njury sustained while voluntarily taking drugs which federal law prohibits dispensing without a prescription…unless the drug is taken as prescribed or administered by a

licensed physician" and (2) "injury sustained as a result of being legally intoxicated from the use of alcohol." (Doc. 35). Again, the record establishes that at the time of his death, Trevino had a "high to toxic" level of Methadone in his system, normal levels of Diazepam and Venlafaxine, and a blood-alcohol level of 107 mg/dl, and that he died as a direct result of the synergistic effect of drug and alcohol intoxication. Further, it is undisputed that over the course of approximately a year and a half, doctors repeatedly warned Trevino to abstain from using alcohol while taking his prescribed medications. Plaintiff argues that Trevino may have unintentionally ingested more Methadone than prescribed, apparently in an attempt to argue that he did not voluntarily take this drug in a manner other than as prescribed. (Doc. 36). However, even if the Court afforded Plaintiff this reading of the exclusion, no genuine dispute exists that Trevino acted in direct contravention of his doctors' repeated advice by drinking alcohol while taking his prescribed medications. Plaintiffs' argument that Trevino's doctors knew about his alcohol consumption and continued to prescribe the medications does not change this fact, nor does Dr. Sanchez's observation that at times prior to his death, Trevino was taking his medications correctly and "drinking much less." Therefore, the Court finds that the prescription drug exclusion unequivocally bars coverage in this case.

      Hartford also appeals to the intoxication exclusion, pointing out that Trevino's blood-alcohol level was above the legal limit according to the definition contained within the Texas Penal Code. *See* TEX. PENAL CODE § 49.01. Further, as Hartford observes, both the Southern District of Texas and at least one court in Texas have refrained from interpreting this exclusion to negate coverage only where intoxication was the *sole* cause of injury. In *Likens v. Hartford Life & Accident Ins. Co.*, 794 F.Supp.2d 720 (S.D.Tex. 2011), the court found that no reasonable jury could find facts that would avoid the exclusion where the insured died from blunt force

trauma sustained after falling at home while intoxicated, as the insured's intoxication was the proximate cause of his death. *Likens*, 794 F.Supp.2d at 726. The insured in *Edwards v. Emps. Ret. Sys. of Tex.*, 2004 WL 1898253 (Tex.App.-Austin Aug. 26, 2004, no pet.), died from blunt force injuries suffered in a single-vehicle accident after driving while intoxicated, leading the court to observe that "[l]imiting the exclusion to accidents solely caused by the insured's being under the influence of alcohol would reserve its application to rare instances where the accident was unrelated to impaired judgment or dulled driving response to adverse conditions—perhaps the rare case of alcohol poisoning. Such an interpretation would render the provision practically meaningless." *Edwards*, 2004 WL 1898253 at *6. The court also reasoned that the intoxication exclusion lacked the language "independently of all other causes" found elsewhere in the policy, itself indicative that the exclusion did not impose a sole cause standard. *Id.* at *5. Plaintiff does not, in fact, dispute these cases' interpretation of the causation standard in the intoxication exclusion, but merely argues that Trevino should not be held to the definition of intoxication contained within the Texas Penal Code as he was not driving or in public but was drinking in the privacy of his own home. (Doc. 36). The court in *Likens* also addressed and dismissed this argument, noting that the language of the exclusion imposes no requirement that the insured be intoxicated in a manner subject to criminal penalty, and further observing that other Texas statutory provisions have adopted this definition outside the criminal context. *Likens*, 794 F.Supp.2d at 727. Here, as in *Likens*, at the time of his death Trevino met all known legal definitions of intoxication under Texas law, and any interpretation of this term that would exclude drinking at home is simply not a reasonable one, even if the term is ambiguous. As no dispute exists that a contributing factor to Trevino's death was alcohol intoxication, the Court finds that the intoxication exclusion also negates coverage in this case.

### 3.     Bad Faith Claims

As Hartford correctly notes, an insured cannot sustain a bad faith claim if an insurer refuses to pay a claim that is not covered by the policy. (Doc. 35); *Republic Ins. Co. v. Stoker*, 903 S.W.2d 338, 341 (Tex. 1995). Further, no violation of the DTPA or Insurance Code exists unless an insurer denies a claim when liability is "reasonably clear." *Provident Am. Ins. Co. v. Castaneda*, 988 S.W.2d 189, 194 (Tex. 1998). Having determined that the policy's definition of "injury" and the prescription drug and intoxication exclusions do not afford coverage under the policy, the Court finds as a matter of law that Hartford did not act in bad faith or violate the DTPA or Insurance Code when it denied Plaintiff's claim on these bases.

### III.    Conclusion

For the foregoing reasons, the Court hereby **ORDERS** that Hartford's Motion for Summary Judgment is **GRANTED**.

SO ORDERED this 20th day of March, 2012, at McAllen, Texas.

_____
Randy Crane
United States District Judge